# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **RHONDA I. ELLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:14-cv-00361-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Carolyn W. Colvin*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Rhonda I. Ellis appeals to the Court from a final decision of the Commissioner of Social Security denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]  (DE 1).  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Ellis applied for DIB in August 2012, alleging disability as of August 1, 2006.  (DE 8 Administrative Record ("AR") 12-27, 173-74).  Her DIB-insured status expired on March 31, 2013 (AR 245), so she must show that she was disabled on or before that date.  *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).  The Commissioner denied Ellis's application initially and upon reconsideration, and Ellis requested an administrative hearing.  (AR 115-18, 122-28).  On November 13, 2013, a hearing was conducted by Administrative Law Judge Maryann Bright ("the ALJ"), at which Ellis, who was represented by counsel, and vocational expert Sharon Ringenberg ("the VE") testified.  (AR 34-86).

---

[1] All parties have consented to the Magistrate Judge.  (DE 11); *see* 28 U.S.C. § 636(c).

On January 30, 2014, the ALJ rendered an unfavorable decision to Ellis, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of light work jobs in the economy as of her date last insured. (AR 12-27). The Appeals Council denied Ellis's request for review (AR 1-8), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Ellis filed a complaint with this Court on November 19, 2014, seeking relief from the Commissioner's final decision. (DE 1). Ellis argues in this appeal that the ALJ: (1) improperly discounted the opinion of Dr. Prevesh Rustagi, her treating psychiatrist; (2) failed to logically connect the evidence of her headaches to the assigned residual functional capacity ("RFC"); and (3) improperly discounted the credibility of her symptom testimony. (DE 17 at 12-22).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Ellis was 53 years old (AR 173); had a 10th grade education (AR 43, 210); and had past work experience as a housekeeper, school aide, waitress, and laundry worker (AR 26, 210). Ellis alleges disability due to depression, anxiety, attention deficit hyperactivity disorder ("ADHD"), headaches, cervical degenerative disc disease, sleep apnea, chronic obstructive pulmonary disease ("COPD"), and obesity. (DE 17 at 2).

### B. Ellis's Testimony at the Hearing

At the hearing, Ellis, who was five feet, seven inches tall and weighed 300 pounds at the time, testified that she lives in a mobile home with her husband, who is employed; she has health insurance through her husband. (AR 41-43). She drives a car three times a week, had driven

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 753-page administrative record necessary to the decision.

alone to the hearing, and drives six hours by herself every few months to visit her children in Illinois. (AR 43, 63). She uses a computer on a daily basis. (AR 64). On a good day, she performs household tasks such as cooking, vacuuming, dusting, and doing dishes, interspersing these tasks with frequent rest periods. (AR 63-64, 69-71). On a bad day, she does not do much of anything; she estimated that she has three or four bad days a week. (AR 63-64, 69-71, 74-75).

Ellis had held just one full-time job in her life, which was doing laundry and housekeeping for a hotel; she quit the job after three years because she felt that she could no longer handle its physical demands. (AR 44-45). When asked why she did not seek other full-time work—presumably less physically demanding work—Ellis responded that she "d[idn't] really know," adding that she was receiving alimony from her husband, was raising three children by herself, and that a waitress job she had held at one point was too physically demanding to perform full time. (AR 46).

When asked why she thought she could not work, Ellis cited chronic pain and fatigue, as well as headaches. (AR 47, 49-50, 54). She takes various medications for her symptoms, attends physical therapy, uses ice and heat, and performs home exercises. (AR 48-51, 54). She had no complaints of medication side effects. (AR 48-49). She stated that she becomes short of breath when performing housework or walking in a store due to her COPD, so she rests frequently; she uses inhalers four to six times a week, but they make her feel jittery. (AR 55-56). She has sleep apnea, to which she attributes a lot of her fatigue, and she uses a CPAP machine. (AR 56-57). Ellis estimated that she could stand for 15 minutes, walk for 35 minutes, and sit for 45 minutes before needing to change positions. (AR 58). She complained of mild bilateral carpal tunnel syndrome symptoms. (AR 58-59). Lights and noise bother her when she has a

severe headache.  (AR 76).

Ellis stated that she also cannot work because she does not like to go out in public.  (AR 47, 50).  She does, however, go to the store by herself twice a month, but she stated that she always takes Xanax before doing so.  (AR 59, 69).  She complained of problems with her memory, difficulty with focus, frequent worrying, and intermittent difficulty in relating to others; she does, however, get along with her family.  (AR 60-62, 67-69).  Ellis stated that she has suicidal thoughts every few months.  (AR 74).  She was participating in mental health counseling at the time of the hearing.  (AR 51).

### C.  Summary of the Medical Evidence Prior to Ellis's Date Last Insured

In July 2005, Ellis underwent an EMG that was positive for mild carpal tunnel syndrome. (AR 303).  In October of that year, she was hospitalized for severe gastroesophageal reflux disease.  (AR 274).  In April 2009, she underwent a sleep study; a bone density test the following month showed osteopenia.  (AR 311-12, 323).  In August 2010, Ellis went to the emergency room for upper back and shoulder complaints.  (AR 336-37).  An X-ray of the thoracic spine showed mild degenerative disc disease and spondylosis of the thoracic spine.  (AR 339).  Also in August, Ellis underwent a second sleep study that showed obstructive sleep apnea.  (AR 343).

Ellis saw Jay Fawver, M.D., a psychiatrist, approximately 18 times from August 2010 to June 2012 for medication management.  (AR 403-57).  On initial evaluation, she had an appropriate affect, logical thought processes, intact memory, and good judgment; she denied suicidal or homicidal ideations.  (AR 407).  Dr. Fawver assessed cyclothymic disorder; ADHD, combined type; social anxiety disorder; generalized anxiety disorder; bulimia nervosa, nonpurging type; obsessive compulsive disorder; sleep apnea, obstructive; tobacco use disorder;

COPD; and obesity.  (AR 407, 458).

In May 2011, a second bone density test was negative.  (AR 383).  In May 2012, a

lumbar spine X-ray showed minimal degenerative changes.  (AR 397).  That same month, Ellis

saw Lisa Holtsclaw, D.O., for complaints of diarrhea and low back pain.  (AR 472).  Dr.

Holtsclaw diagnosed her with hernia, diarrhea, GERD, and sciatica.  (AR 473).  The following

month, Ellis complained to Dr. Holtsclaw of having pain from her neck to her legs and that her

legs felt very weak; she also had diarrhea, a hiatal hernia, and GERD.  (AR 467).  Later that

month she complained of a one-month history of chronic fatigue, but stated that it did not limit

her activities.  (AR 461).

Ellis saw Dr. Prevesh Rustagi, a psychiatrist, approximately 16 times from June 2012 to

September 2013.  (AR 474-86, 539-48, 557-63, 572-77, 713-21).  An initial mental status

examination revealed a blunted affect, concrete thinking, and goal-directed thought associations;

she had no hallucinations or delusions.  (AR 482).  She exhibited normal social judgment,

attention, concentration, and memory.  (AR 482).  Dr. Rustagi's impression was depression and

anxiety, and he assigned her a Global Assessment of Functioning ("GAF") score of 56.[3]  (AR

482).  Ellis stated that she was not interested in attending psychotherapy.  (AR 481).  In order to

get a clean start in medication management, Dr. Rustagi stopped all of Ellis's medications except

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am.
Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000).  A GAF score
of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  A GAF
score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-
workers).  *Id.*  "The American Psychiatric Association no longer uses the GAF as a metric."  *Spencer v. Colvin*, No.
13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic &
Statistical Manual of Mental Disorders* 16 (5th ed. 2013)).  However, the medical sources of record used GAF
scores in assessing Ellis, so they are relevant to the ALJ's decision.  *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093,
1099 (7th Cir. 2013)).

for Xanax, which he continued on an as-needed basis. (AR 482). In July, Ellis reported that her mood, energy, motivation, and focus had all decreased; Dr. Rustagi started her on Wellbutrin XL. (AR 480). Three weeks later, Ellis reported that her mood was doing fairly well, but she was still having problems with focusing; Dr. Rustagi increased her Wellbutrin XL. (AR 478). In August, Ellis stated that she was less attentive and more anxious and reclusive; Dr. Rustagi stopped the Wellbutrin XL and increased her Xanax. (AR 476-77). In September, Ellis complained of increased symptoms of depression and anxiety, as well as problems with memory and concentration; she was isolating herself at home to avoid panic attacks. (AR 545-46). Dr. Rustagi prescribed Stratterra. (AR 546).

Also in September 2012, H.M. Bacchus, M.D., examined Ellis at the request of Social Security. (AR 513-15). His impression was morbid obesity, untreated; sleep apnea per history, treated and monitored; COPD per history, treated and monitored; GERD per history, treated; mild lumbar degenerative disc disease per history; carpal tunnel of the left hand per history; bipolar/depression/panic disorder/agoraphobia/social anxiety/ADD/memory loss per history, treated and monitored; and history of alcohol, drug, and tobacco abuse. (AR 514-15). Dr. Bacchus found that Ellis could perform four to six hours of light duties with noncontinuous sitting, standing, or walking in a low-stress environment with simplified instructions; she should avoid heights and not perform any keyboarding with the left hand. (AR 515). He stated that her ability to emotionally handle a work environment was impaired and that a mental health evaluation would be helpful. (AR 515).

In October 2012, Ellis was evaluated by Amanda Mayle, Psy.D., at the request of Social Security. (AR 508-12). A mental status exam revealed a depressed mood, flat affect, and a

slow, but logical, thought process; her thought content included overvalued ideas, phobias, and preoccupations. (AR 509-10). Her insight, judgment, attention, memory, and grasp of concepts, however, were adequate. (AR 512). Dr. Mayle found that Ellis presented with significant mood and behavioral instability that appeared to affect her functioning, and that her current level of functioning did not appear likely to change in the near future. (AR 511). Dr. Mayle assigned Ellis a GAF score of 50 and diagnoses of major depressive disorder, single episode, severe, without psychotic features; generalized anxiety disorders; panic disorder with agoraphobia; social phobia; and attention-deficit disorder, predominantly inattentive type. (AR 511).

Later that month, Donna Unversaw, Ph.D., a state agency psychologist, reviewed Ellis's record and concluded that she could understand, remember, and carry out simple unskilled tasks; have limited social interactions with coworkers and supervisors; attend to task for sufficient periods of time to complete tasks; and manage the stresses involved with unskilled work. (AR 96). These findings were later affirmed by a second state agency psychologist, William Shipley, Ph.D. (AR 111).

Ellis returned to Dr. Rustagi in October 2012, reporting small and somewhat inconsistent improvements in her symptoms. (AR 543-44). She had titrated herself up to 80 mg of Strattera, but was unsure how much it was helping overall. (AR 543). Her mood and affect were anxious. (AR 543). Dr. Rustagi increased her dosage of Strattera. (AR 543). The next month, Ellis told Dr. Rustagi that her depression had been "creeping up" over the last few months, significantly worsening in the last two weeks. (AR 541-42). She complained of sadness, lack of energy, and irritability; she was isolating herself more and spending more time in bed. (AR 541). Dr. Rustagi started her on Citalopram. (AR 542).

In November 2012, B. Whitley, M.D., a state agency physician, reviewed Ellis's record and found that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; push and pull within her lifting restrictions; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and occasionally climb ladders, ropes, or scaffolds; and must avoid uneven surfaces, unprotected heights, and concentrated exposure to wetness or hazards. (AR 92-94). Dr. Whitley's opinion was later affirmed by M. Brill, a second state agency physician. (AR 109).

Also in November 2012, Ellis saw Dr. Holtsclaw for complaints of constant jaw pain, as well as headaches, neck pain, and chest pressure. (AR 565). She told Dr. Holtsclaw that she had experienced headaches "practically all of her life," but that they had worsened recently. (AR 565). Ellis's complaints, however, did not limit her activities. (AR 565). Dr. Holtsclaw adjusted her medications and scheduled her for a followup in six months. (AR 565).

In December 2012, Ellis told Dr. Rustagi that her depression was unchanged, identifying symptoms of irritability, fatigue, low motivation, increased sleep, isolation, and continuous tension and worry. (AR 539-40). On mental status exam, her attention and concentration were normal. (AR 539). Dr. Rustagi stopped her Citalopram and started Sertraline. (AR 540). In January 2013, Ellis reported some improvement in her symptoms since starting on Sertraline. (AR 563). Her energy and motivation were improved in the morning, although low in the afternoon; she was sleeping well at night. (AR 563). She still struggled with concentration and focus. (AR 563). On a mental status exam, Ellis's concentration, attention, social judgment, thought formation, and abstract thinking were all normal. (AR 563).

By March 2013, Ellis reported that the improvement she had noted from the Sertraline

had "fizzled out." (AR 561). Her mood and affect were sad and anxious, but the remainder of a mental status exam was normal; Dr. Rustagi prescribed Buspirone. (AR 561-62). In April, Ellis reported that the Strattera was helping her focus, but she still felt sad and lacked energy and interest. (AR 557-58). A mental status exam revealed a blunted affect, but was otherwise normal. (AR 557). Dr. Rustagi decreased her Sertraline and stopped the Buspirone. (AR 558).

### D. Summary of the Relevant Medical Evidence After Ellis's DIB Eligibility Expired

In May 2013, Ellis reported to Dr. Rustagi that her mood was reasonably good in quality and stability on her current medications, but that her ability to focus was not good, even on 100 mg of Strattera. (AR 720-21). She was tolerating her medications well. (AR 720). On mental status exam, her attention and concentration were distractible. (AR 720). Dr. Rustagi prescribed Focalin and discontinued Strattera. (AR 721).

In May 2013, Ellis was seen by Fort Wayne Neurological Center for complaints of chronic daily headaches; she was sent to physical therapy, which helped to relieve her headache pain for one to two days after each session. (AR 585-86, 733-34, 737, 739, 741). An EMG of her upper extremities was normal bilaterally. (AR 733). She attended 24 physical therapy sessions from June to October 2013 for a recent onset of temporomandibular joint pain and more long standing cervical symptoms. (AR 583-656). An MRI of her cervical spine showed arthritis and nerve root impingement at C7. (AR 709). She had 5/5 strength in her extremities, and her sensation was intact. (AR 733-34). She did have some muscle spasms in her trapezius area on the left side and limited flexion and right lateral rotation of her cervical spine. (AR 734). She was prescribed Tizanidine for her headaches. (AR 734). On July 30, 2013, Ellis told the nurse practitioner that she rarely takes Xanax, stating that she could not even remember the last time

she took it.  (AR 734).

In June 2013, Dr. Rustagi wrote that considering Ellis's long-term partial treatment response, the current medication combination was working as expected.  (AR 718).  No side effects were noted or reported.  (AR 718).  She had intact memory, social judgment, and thought associations, and she was able to sustain focus on the topics being discussed.  (AR 718).  She had a euthymic mood with a good range of affect.  (AR 718).  Her medications were continued as prescribed.  (AR 719).  In August, Ellis reported that she had been decompensating in the last month, having more difficulty with anxiety, racing heart, and tension in her jaw.  (AR 716).  She was more irritable, impatient, and socially isolated.  (AR 716).  Aside from an anxious mood and affect, a mental status exam was normal.  (AR 716).  Dr. Rustagi discontinued her Focalin and increased the Sertraline.  (AR 717).

On August 31, 2013, Dr. Rustagi completed a mental medical source statement, reporting that he had been seeing Ellis monthly for 14 months.  (AR 572-76).  He assigned a current GAF of 54 and a highest-past-year GAF of 59, reflective of moderate symptoms; a guarded prognosis; and diagnoses of anxiety, depression, and ADHD.  (AR 572).  He identified clinical findings of substantial social isolation due to fear of crowds and stated that her anxiety was much more disabling than her depression.  (AR 572).  He checked boxes for the following signs and symptoms: loss of interest; decreased energy; blunt affect; feelings of worthlessness; persistent anxiety; mood and affect disturbances; difficulty concentrating; pathological dependence; apprehensive expectation; emotional isolation; persistent irrational fear of a specific object, activity, or situation; motor tension; emotional lability; easy distractability; and sleep disturbance.  (AR 573).

Dr. Rustagi further opined that Ellis was "unable to meet competitive standards" in maintaining regular attendance and punctuality, sustaining an ordinary routine without special supervision, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in a routine work setting, dealing with normal work stress, and using public transportation. (AR 574-75). He indicated that she was "seriously limited" in maintaining attention for a two-hour period, working in coordination with or proximity to others without being unduly distracted, setting realistic goals or making plans independently of others, dealing with stress of semiskilled and skilled work, interacting appropriately with the public, maintaining socially appropriate behavior, and traveling in unfamiliar places. (AR 574-75). He indicated that Ellis found the following tasks stressful: working within a schedule, making decisions, completing tasks, working with other people, dealing with the public, getting to work regularly, and the fear of failure at work. (AR 576). He estimated that her condition would cause her to be absent from work more than four days per month. (AR 576).

In September 2013, Dr. Rustagi wrote that Ellis was seeing small, incremental improvements in her condition. (AR 713-14). She was feeling a little less depressed, and her ability to focus was improving; she still, however, worried all the time. (AR 713). A mental status exam was normal, revealing fair attention and concentration. (AR 714). Dr. Rustagi prescribed Trazodone. (AR 714).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not "reweigh the evidence, resolve conflicts, decide questions of credibility," or substitute its judgment for the Commissioner's. *Id.* (citations omitted). Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On January 15, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 12-27). She found at step one that Ellis had not engaged in substantial gainful activity from August 1, 2006, her alleged onset date, through March 31, 2013, her date last insured. (AR 14). At step two, the ALJ concluded that Ellis had the following severe impairments as of her date last insured: anxiety, depression, ADHD, headaches, cervical degenerative disc disease, sleep apnea, COPD per history, and obesity. (AR 14). At step three,

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

the ALJ determined that Ellis's impairment or combination of impairments were not severe

enough to meet a listing. (AR 14-16). Before proceeding to step four, the ALJ assigned Ellis the

following RFC:

> [T]hrough the date last insured, the claimant had the [RFC] to perform lifting,
> carrying, pushing and pulling up to 20 pounds occasionally, and up to 10 pounds
> frequently; standing and/or walking (with normal breaks) for approximately 6
> hours per 8 hour workday, and sitting (with normal breaks) for approximately 6
> hours per 8 hour workday; frequent climbing of ramps and stairs; occasional
> climbing of ladders, ropes or scaffolds; occasional balancing, stooping,
> crouching, kneeling and crawling; and occasional overhead reaching. She should
> avoid concentrated exposure to excessive vibration, extreme cold and heat,
> wetness, humidity, respiratory irritants such as fumes, odors, dusts, gases, and
> poorly ventilated areas, as well as bright and/or flashing lights, and very loud
> noise; the claimant must also avoid concentrated exposure to hazards such as
> unprotected heights and dangerous unguarded machinery. She is unable to
> engage in complex or detailed tasks, but can perform simple, routine and
> repetitive tasks consistent with unskilled work, and is able to sustain and attend to
> task throughout the workday. She is limited to superficial interaction with
> coworkers, supervisors, and the public, with superficial interaction defined as
> occasional and casual contact not involving prolonged conversation or discussion
> of involved issues. Contact with supervisors still involves necessary instruction.
> She is also limited to work in a low stress job, defined as having only occasional
> decision making required, and only occasional changes in the work setting.

(AR 16-17).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that as of her

date last insured Ellis was unable to perform any of her past relevant work. (AR 26). The ALJ

then concluded at step five that as of her date last insured Ellis could perform a significant

number of light work jobs in the economy, including retail marker, dining room attendant, and

package sorter. (AR 27). Therefore, Ellis's claim for DIB was denied. (AR 27).

### C. The ALJ's Consideration of Dr. Rustagi's Opinion
### Is Supported by Substantial Evidence

Ellis first argues that the ALJ improperly discounted the opinion of her treating

psychiatrist, Dr. Rustagi. She emphasizes that Dr. Rustagi opined in his medical source statement in August 2013 that she would likely miss more than four days of work per month due to her mental impairments. (AR 576). Ellis then points to the VE's testimony that an individual could not maintain competitive employment if she consistently missed three or more days per month. (AR 81-82).

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "[a] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

Notably, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). "[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citation omitted).

Here, the ALJ thoroughly considered Dr. Rustagi's records, penning five paragraphs about his treatment notes and medical source statement. The ALJ first considered Dr. Rustagi's 2012 treatment notes. In July 2012, Dr. Rustagi wrote that Ellis's mood was doing fairly well, other than her problems with focus, procrastination, and disorganization, which had been lifelong issues for her. (AR 19 (citing AR 478)). In September, Ellis complained to Dr. Rustagi of increased depressive symptoms, low motivation, low energy, and "horrible" concentration. (AR 19 (citing AR 474)). In December, Dr. Rustagi wrote that Ellis's depression was unchanged, with symptoms of irritability, fatigue, isolation, and lack of motivation; however, a mental status exam revealed normal attention and concentration, normal mood and affect, and a cooperative attitude. (AR 21 (citing AR 539-40)).

The ALJ also thoroughly considered Dr. Rustagi's 2013 treatment notes. Dr. Rustagi observed that in a mental status exam in March, Ellis had a pleasant and cooperative demeanor, but a sad and anxious mood and affect; her thought formation, abstract thinking, thought associations, social judgment, memory, attention, and concentration were all normal. (AR 22 (citing AR 561)). She was sleeping well and had no thoughts of harming herself or others. (AR 22 (citing AR 561)). The results of a mental status exam in April were similar, except that she

had a blunted affect.  (AR 22 (citing AR 557)).  In May, Dr. Rustagi wrote that Ellis's mood was reasonably good and stable on her current medications; her focus, however, was poor, as she felt disorganized and procrastinated any type of tedious tasks.  (AR 23 (citing AR 720)).  A mental status exam was unremarkable with euthymic mood and good range of affect, except for distractible attention and concentration.  (AR 23 (citing AR 720)).  A mental status exam the following month was also unremarkable, observing that Ellis could sustain focus on the topics being discussed.  (AR 23 (AR 718)).  In September, Ellis reported some small improvements and was feeling a little less depressed; a mental status exam was unremarkable, with fair concentration.  (AR 23 (citing AR 713-14)).

The ALJ then reviewed Dr. Rustagi's mental medical source statement dated August 31, 2013, in which Dr. Rustagi relayed Ellis's report that her symptoms had been worsening over the last six years and that she had become reclusive.  (AR 23 (citing AR 572)).  Dr. Rustagi gave Ellis a guarded prognosis due to limited motivation, and he estimated that she would likely miss more than four days of work a month due to her mental impairment.  (AR 24 (citing AR 572, 576)).  Dr. Rustagi represented that Ellis was "unable to meet competitive standards" in maintaining attendance and being punctual, sustaining an ordinary routine, completing a normal workday/workweek, responding appropriately to changes in the work setting, dealing with normal work stress, and using public transportation; and "seriously limited" in maintaining attention for two-hour segments, working in coordination with or in proximity to others, interacting appropriately with the public, maintaining socially appropriate behavior, and traveling in unfamiliar places.  (AR 23-24 (citing AR 574-75)).

After summarizing Dr. Rustagi's records, the ALJ concluded that the opinions in his

mental source statement were not entitled to controlling weight because they were internally inconsistent with his own treatment notes, as well as the assigned current GAF score of 54 and highest-past-year GAF score of 59. (AR 25 (citing AR 572)). The ALJ further noted that Dr. Rustagi seemed to question Ellis's motivation. (AR 25 (citing AR 572)). Ultimately, the ALJ assigned Dr. Rustagi's opinion "little weight." (AR 25). Ellis challenges the ALJ's stated rationale for discounting Dr. Rustagi's opinion.

Ellis first argues that the assigned GAF scores of 54 and 59, reflective of moderate symptoms, are not necessarily inconsistent with the severe limitations in Dr. Rustagi's medical source statement. She emphasizes that, as the Seventh Circuit has acknowledged, a person who suffers from mental illness will have good and bad days, so a snapshot of a single moment says little about the person's overall condition. *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2001). Ellis additionally argues that her low motivation may be a symptom of her depression, and thus, that the ALJ should not have discounted Dr. Rustagi's opinion on that basis.

Ellis's arguments concerning the GAF scores and low motivation have some merit. However, they do not diminish the fact that the severe limitations assigned by Dr. Rustagi in his medical source statement are not supported by the more benign findings in his monthly treatment notes. As the ALJ observed, Ellis's monthly mental status exams documented by Dr. Rustagi were relatively unremarkable, often revealing normal attention and concentration, social judgment, thought formation, and memory. Thus, the Court cannot fault the ALJ for viewing Dr. Rustagi's opinions as internally inconsistent, and as such, worthy of less weight. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (noting that an ALJ can discount a

treating physician's opinion if it is internally inconsistent); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulate[s] his reasons for crediting or rejecting evidence of disability." (alteration in original) (citation omitted)); *Clifford*, 227 F.3d at 871 (explaining that medical evidence may be discounted if it is internally inconsistent).

Ellis further argues that even if Dr. Rustagi's opinion was not entitled to controlling weight, the ALJ should have assigned the opinion more weight under the checklist factors of 20 C.F.R. § 404.1527(c). "It is true that the regulation requires the ALJ to consider those six factors, but [her] decision need only include 'good reasons' for the weight given to the treating source's opinion rather than 'an exhaustive factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D. Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09–6263, 2011 WL 915719, at *3 (6th Cir. Mar.16, 2011)). That is, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

Here, the ALJ generally covered the ground of the checklist factors. Specifically, the ALJ expressly acknowledged Dr. Rustagi's specialty in psychiatry. (AR 23). The ALJ obviously considered the length of the treatment relationship, frequency of examination, and the nature and extent of the treatment relationship, as she discussed most of Dr. Rustagi's monthly treatment notes spanning from July 2012 through August 2013. (AR 19-24). And as stated above, the ALJ found that Dr. Rustagi's monthly treatment notes did not support the severe

limitations articulated in his mental status report. In doing so, the ALJ sufficiently articulated a good reason for discounting Dr. Rustagi's opinion. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons—a very deferential standard that we have, in fact, deemed lax." (alteration in original) (citation and internal quotations marks omitted)).

In sum, Ellis's challenge to the ALJ's discounting of Dr. Rustagi's opinion amounts to merely a plea to reweigh the evidence—a task that the Court cannot do. *See Clifford*, 227 F.3d at 869 (The Court "do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." (citations omitted)). The ALJ's rationale for discounting the severe opinions in Dr. Rustagi's August 2013 medical source statement is sufficiently traceable and adequately supported by the record. Therefore, Ellis's first argument does not warrant a remand of the ALJ's decision.

### D. The ALJ Adequately Considered the Evidence of Ellis's Headaches When Assigning the RFC

Next, Ellis argues that the ALJ failed to "logically connect[]" the evidence of her headaches to the assigned RFC. More particularly, Ellis contends that while the ALJ acknowledged her problem with headaches and summarized the evaluation and treatment that she underwent for this condition, the ALJ did not state "specifically what limitations in her RFC are related to her headaches." (DE 17 at 17). Contrary to Ellis's assertion, the Court is able to adequately trace the ALJ's reasoning concerning Ellis's complaints of headaches prior to her date last insured and the assigned RFC.

The RFC is a determination of the tasks that a claimant can do despite her limitations. 20

C.F.R. § 404.1545(a)(1). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p, 1996 WL 374183, at *5; *see* 20 C.F.R. § 404.1545. Therefore, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. § 404.1545(a)(2); *see Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

The ALJ considered Ellis's symptom testimony about her headache pain. The ALJ noted that Ellis testified at the hearing, which was held eight months after her date last insured, that she had been experiencing persistent headaches. (AR 17, 50, 75-77). Ellis stated that her TMJ had started just six months earlier, but that she had headaches and neck pain for "as far back as [she] c[ould] remember." (AR 50, 53). She testified that she had seen a neurologist several months earlier for these symptoms, that she had been going to physical therapy for three or four months, and that physical therapy was helpful in reducing her pain, at least for a few days after each session. (AR 48-50). When asked why she had only recently sought treatment for this purportedly long-standing condition, Ellis responded that she had been taking a lot of ibuprofen and Tylenol for her headaches and finally "had [her] fill of feeling like this all the time . . . and decided to do something about it." (AR 54).

In addition to Ellis's testimony about her headache pain, the ALJ considered the minimal medical evidence pertaining to Ellis's headaches prior to her date last insured. The ALJ noted

that Ellis first mentioned to Dr. Holtsclaw that she was having a lot of jaw pain, together with headaches and chest pain, in November 2012.  (AR 21 (citing AR 55)).  The ALJ observed that Dr. Holtsclaw prescribed Tramadol and treated Ellis for these complaints from June 2013 through September 2013, *after* her date last insured.  (AR 24, 28).  The ALJ additionally considered that Ellis was seen by a nurse practitioner at Fort Wayne Neurology in May 2013 and July 2013, who observed that an EMG was normal and an MRI showed multilevel degenerative disc disease, as well as possible C7 nerve root impingement on the left.  (AR 23 (citing AR 733-46)).  The nurse practitioner started Ellis on Tizanidine.  (AR 23 (citing AR 733-46)).

In fact, Ellis's attorney acknowledged at the hearing that although Ellis complained to some extent of headaches prior to her date last insured, the diagnosis and treatment of her TMJ, headaches, and neck problems occurred *after* her date last insured.  (AR 37-38).  As such, Ellis's attorney asserted that it was Ellis's mental health problems that prevented her from working prior to her date last insured, an assertion that the ALJ notes in her decision.  (AR 25, 37-38).

The ALJ also considered that neither Dr. Holtsclaw, nor any other doctor, assigned Ellis any limitations due to her complaints of headaches.  "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *see Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004) ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.").  Additionally, the ALJ observed that prior to Ellis's date last insured, Ellis had received only conservative treatment for her complaints.  (AR 26); *see Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (discounting the severity of claimant's

complaints where his treatment was "relatively conservative" and "inconsistent with [his] complaints"). For example, the ALJ noted that at the time of the hearing Ellis's neurologist had referred her to physical therapy, but he had not yet prescribed her any medications. (AR 25).

Moreover, it is obvious that the ALJ considered Ellis's headaches when assigning the RFC, as the ALJ precluded Ellis from work areas involving "bright and/or flashing lights, and very loud noise." (AR 16). This limitation accounts for Ellis's testimony that bright lights and noise sometimes bother her when she has a bad headache. (AR 76); *see Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."); 20 C.F.R. § 404.1545(a)(3) ("[W]e will assess your [RFC] based on all of the relevant medical and other evidence.").

In sum, the Court can adequately trace the ALJ's logic between the evidence and testimony of record pertaining to Ellis's headaches and the RFC ultimately assigned by the ALJ. As such, the ALJ has done enough in this instance.

### E. The ALJ's Credibility Determination Will Not Be Disturbed

In her third argument, Ellis asserts that the ALJ improperly discounted the credibility of her symptom testimony. For the following reasons, the ALJ's credibility determination will be affirmed.

An ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)

(citation omitted), creating "an accurate and logical bridge between the evidence and the result,"
*Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will
be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435. *See Carradine v. Barnhart*,
360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the
ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the
witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best
position to observe witnesses, [courts] usually do not upset credibility determinations on appeal
so long as they find some support in the record and are not patently wrong." (citations omitted)).

In assessing Ellis's credibility, the ALJ found that Ellis's medically determinable
impairments could reasonably be expected to cause the alleged symptoms, but that her
statements concerning the intensity, persistence, and limiting effects of these symptoms were
"not entirely credible." More specifically, the ALJ reasoned:

> The claimant has a record of treatment for neck/back pain, COPD, and headaches.
> However, the diagnostic testing does not support a more limiting [RFC] than
> stated above. The cervical MRI showed degenerative changes and possible nerve
> root impingement, but exam findings show 5/5 strength, and EMG studies being
> normal. Per the attorney, the claimant's mental impairments prevented work prior
> to the date last insured. Yet she is prescribed Xanax, and only takes it rarely. She
> has received psychiatric treatment, but has had no psychiatric hospitalizations or
> partial hospitalizations. Most of her mental status exams have been overall
> unremarkable. Also, the claimant's daily activities are not as limited as one
> would expect of a totally disabled individual. The claimant is able to perform her
> own hygiene, dress/undress, prepare simple meals, perform light household
> chores, shop, pay bills, use a computer, go out alone, and drive a car. She came to
> the hearing alone, having driven herself. She also noted that she drives (6 hour
> drive) to visit relatives every 4 months. She was noted to get up and out of the
> hearing room quickly. Also, the claimant has a poor work history.

(AR 25). Ellis criticizes all of the ALJ's reasons for discounting her credibility, and the Court
will discuss each of them in turn.

Ellis first reiterates her challenges to the ALJ's consideration of her testimony about her headaches and the ALJ's evaluation of Dr. Rustagi's opinion, including the ALJ's characterization of most of Dr. Rustagi's mental status exams as unremarkable. For the reasons already stated, the ALJ's reasons for discounting Ellis's headache complaints and for assigning little weight to Dr. Rustagi's opinion were sufficiently articulated and supported.[5]

Next Ellis argues that the ALJ "cherry-picked" her daily activities when concluding that they were not as limited as one would expect of a totally disabled individual. She cites several statements from Ellis and her daughter that Ellis stays in her pajamas most days, that even simple grocery trips cause major stress and anxiety, and that even routine activities exhaust her. (AR 241, 244, 511). Contrary to Ellis's assertions, the ALJ properly considered her daily activities. *See* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The ALJ noted that despite Ellis's testimony of disabling physical and mental limitations, she could still perform her own self care, regularly complete many household tasks, shop alone, use a computer, and drive a car three times a week. The ALJ found it particularly notable that Ellis

_____

[5] Ellis additionally argues that the severity of her complaints are supported by certain statements made in Dr. Mayle's October 2012 consultative report, including that she has significant mood and behavioral instability, that it is hard for her to get up in the morning, that she often does nothing, that it was unlikely that her current level of functioning would change in the near future, and the GAF score of 50 assigned by Dr. Mayle. (DE 28 at 4). The ALJ did consider Dr. Mayle's evaluation, but observed that the mental status exam revealed that Ellis had adequate memory, judgement, insight, and attention despite Ellis's complaint of problems in these areas. (AR 20, 25-26). The ALJ resolved the conflicting medical evidence by reasonably relying on Dr. Unversaw's opinion and finding that Dr. Mayle's report—which did not assign any specific limitations—was not inconsistent with the assigned RFC. (AR 25; *see* AR 110-11); *see Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."); *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004) ("The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." (citations omitted)); 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.").

drives herself six hours every few months to visit relatives and that she drove herself to the hearing. In doing so, the ALJ properly considered Ellis's activities as just one factor in the credibility analysis and wisely did not place "undue weight on [her] household activities in assessing [her] ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (collecting cases).

Third, Ellis criticizes the ALJ for his statement that "she was prescribed Xanax, and only takes it rarely." (AR 25). Ellis argues that she was taking other medications for her mental impairments during the relevant period, asserting that "[t]he ALJ failed to explain how taking only one psychiatric medication rarely discredits her testimony when she being prescribed and taking many other psychiatric medications." (DE 17 at 20-21). But the ALJ did consider that Ellis had been prescribed, and was taking, various other psychotropic medications. (*See* AR 18, 22-23). Ellis misconstrues the ALJ's reasoning in citing her use of Xanax; the Court is able to trace the ALJ's rationale for making this point—Ellis made inconsistent statements about her use of Xanax. *See* SSR 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record.").

To explain, Ellis testified at the hearing that she could not work because she did not like to go out in public, yet she was able to go alone to the store twice a month. (AR 59). In doing so, she emphasized: "I always take my Xanax before [I go to the store] so I wait a little bit until that calms me down a little bit and then I will go." (AR 59). But Ellis told the nurse practitioner at Fort Wayne Neurology just a few months earlier that she "rarely takes [Xanax], and cannot even remember the last time she took the medicine." (AR 734). Considering the inconsistency

of these statements, the ALJ's comment about Ellis's rare use of Xanax supports the ALJ's credibility determination.  *See, e.g.*, *Kornfield v. Apfel*, No. 00C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements).

Fourth, Ellis argues that the ALJ relied too heavily on the fact that she never had a psychiatric hospitalization.  But the ALJ is entitled to consider the treatment that a claimant has undergone.  *See* 20 C.F.R. § 404.1529(c)(3) (stating that the treatment a claimant has undergone is a factor to be considered when assessing the credibility of a claimant's complaints).  Consistent with that observation, the ALJ later in her decision specifically considered the conservative nature of Ellis's course of treatment for her various conditions prior to her date last insured.  (AR 26); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-69 (7th Cir. 2010) (collecting cases holding that "tidy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense").  Thus, the ALJ did not err when considering as a factor Ellis's rather conservative treatment history, including her lack of psychiatric hospitalizations, when discounting Ellis's complaints of disabling mental symptoms. *See Simila*, 573 F.3d at 519 (affirming the ALJ's consideration of claimant's relatively conservative treatment history when discounting the severity of her symptom testimony).

Ellis also contends that the ALJ unfairly considered her poor work history as a factor, pointing to her "long history of mental illness" and headaches.  (DE 17 at 21-22).  Although the Seventh Circuit has held that a poor work history may not count against a claimant when the evidence demonstrates that her medical impairments prevented her from working, *see Sarchet v. Chater*, 78 F.3d 305, 308 (7th Cir. 1996), here Ellis did not demonstrate that mental illness or headaches prevented her from working full time over the years.  Rather, the ALJ reasonably

observed that Ellis was 46 years old as of her alleged onset date and that she had held just one full-time job (laundry). Ellis testified that she quit that job after three years because it was too physically demanding. (AR 45). When asked why she did not seek some other type of full-time work—presumably, less physically demanding work—Ellis responded that she "d[idn't] know really," stating that she was receiving alimony from her husband, was raising three children by herself, and she presumed a waitress job she had held at one point would be too physically demanding if performed full time. Considering this rather vague response to the ALJ's questioning, the ALJ did not err by considering Ellis's poor work history as a factor in her credibility determination. *See Simila*, 573 F.3d at 520 (considering, pursuant to 20 C.F.R. § 404.1529(c)(3), that the claimant's declining earnings prior to the onset of his alleged disability was an indicator of a lack of effort to find work).

In her sixth argument, Ellis challenges the ALJ's observation that after the hearing Ellis "was noted to get up and out of the hearing room quickly." (AR 25). Ellis acknowledges that an ALJ's observation at a hearing is entitled to great deference under Social Security Ruling 96-7p, but she emphasizes that "there were no observations regarding her mental impairments." (DE 28 at 11). But Ellis fails to explain how this undercuts the ALJ's credibility determination. Ellis complained of both mental *and* physical limitations as the basis for her DIB application (DE 17 at 2), and thus, the ALJ's observation of Ellis's movement at the hearing was relevant to her claim of physically disabling conditions.

At the end of the day, "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, when assessing

the credibility of Ellis's symptom testimony, the ALJ built an adequate and logical bridge between the evidence and her conclusion, *see Ribaudo*, 458 F.3d at 584, and her conclusion is not "patently wrong," *Powers*, 207 F.3d at 435.  Consequently, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will stand.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Ellis.

SO ORDERED.

Entered this 23rd day of June 2016.

/s/ Susan Collins      
Susan Collins,
United States Magistrate Judge